## IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| A.T., individually as parent and natural guardian of L.T. and B.T., minors | ) )  ) | No.  2:25-cv-00705 |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | |
| LAWRENCE COUNTY CHILDREN AND YOUTH SERVICES, JOHN BOUT, Director of Lawrence County Children and Youth Services, in his official and individual capacity, CHRISTINA JONES, in her official and individual capacity, ELIZABETH HALL, in her official and individual capacity, STEPHANIE SCHAIBLE, in her official and individual capacity, CAITLYN WINDHORST, in her official and individual capacity | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | JURY TRIAL DEMANDED |
| Defendants. | ) ) | |

A.T., individually and as parent and
natural guardian of L.T. and B.T., minors

Plaintiffs,

v.

LAWRENCE COUNTY
CHILDREN AND YOUTH SERVICES,
JOHN BOUT, Director of Lawrence
County Children and Youth Services,
in his official and individual capacity,
CHRISTINA JONES, in her official and
individual capacity,
ELIZABETH HALL, in her official and
individual capacity,
STEPHANIE SCHAIBLE, in her
official and individual capacity,
CAITLYN WINDHORST, in her
official and individual capacity

Defendants.

## <u>COMPLAINT</u>

**AND NOW,** come the Plaintiffs, A.T., individually and as parent and natural guardian of  L.T., and B.T.., individually and as parent and natural guardian of K.B., L.T., and B.T., by and through their attorneys, THE LINDSAY LAW FIRM, P.C., and Alexander H. Lindsay, Jr., Esquire, and file this following Complaint:

## I.    PARTIES

1.      Plaintiff, A.T., is an adult individual currently residing in 1501 Oldsmar Avenue, Ohio.

2.      The Plaintiff L.T., age 14 is a minor.

3.      The Plaintiff B.T., age 12 is a minor.

4.      The Plaintiff A.T. is the mother of L.T. and B.T., minors and natural guardian of L.T. and B.T.

5.      The Defendant Lawrence County Children and Youth Services (hereinafter "LCCYS"), is a local government agency of Lawrence County, organized pursuant to the laws of the Commonwealth of Pennsylvania, with its principal address 1001 East Washington Street, New Castle, PA. 16101.

6.      Defendant John Bout (hereinafter "Bout") is the Director of the Lawrence County Children and Youth Services and at all times pertinent hereto was the Director.

7.      Defendant Christina Jones (hereinafter "Jones") at all times pertinent was a caseworker of the Lawrence County Children and Youth Services.

8.      Defendant Elizabeth Hall (hereinafter "Hall") at all times pertinent was a caseworker of the Lawrence County Children and Youth Services.

9.      Defendant Stephanie Schaible (hereinafter "Schaible") at all times pertinent was a caseworker of the Lawrence County Children and Youth Services.

10.     Defendant Caitlyn Windhorst (hereinafter "Windhorst") was at all times pertinent a supervisor of the Lawrence County Children and Youth Services.

## II.     <u>JURISDICTION</u>

11.     This suit is brought in the jurisdiction of this Honorable Court conferred under and by the virtue 42 PA U.C.S. §1983 and 28 U.S.C. §1331.

## III.     <u>STATEMENT OF FACTS</u>

### <u>Policy and Custom of the Defendant County Children and Youth Services (LCCYS)</u>

12.     It is the policy and custom of the Defendant LCCYS to instruct LCCYS caseworkers to remove children who are the subjects of a child abuse investigation from their home regardless of whether there are reasonable grounds to believe that minor children were abused or were in imminent risk of serious bodily or physical injury in direct contravention of the provisions of the Pennsylvania Child Protective Services Law, 23 PS. 6301, et seq.

13.     It is the policy and custom of the Defendant LCCYS that in the event that the children in question are attractive, to place the children with pre-adoptive foster homes.

14.     It is the policy and custom of the Defendant LCCYS in order to prevent the parents of the children in question to regain custody of their children, to seize children without due process of law and in violation of the Pennsylvania Child Protective Services Law, 23 PS. 6301, et seq. and the Constitution of the United States.

3

15.    It is the policy and custom of the Defendant LCCYS to set up a series of conditions which must be met by the natural parents which are impossible to meet thereby insuring that the children seized by LCCYS, regardless of whatever danger they are or were in, cannot be returned to the natural parents.

16.    It is the policy and custom of the Defendant LCCYS, once a separation of the children from the natural parents is affected to use its power to prevent any contact between the natural parent and the child in order to ensure that no "bonding" occur with the natural parent and that "bonding" will be established with the foster parents who are pre-adoptive families.

17.    It is the policy and custom of the Defendant LCCYS to intervene in proceedings between the natural parents and the adoptive parents  whom the Defendants have selected and advocate for the adoptive parents suggesting, regardless of the evidence, that the child would be in better circumstances with the pre-adoptive foster parents.

18.    It is the policy and custom of the Defendant LCCYS that in order to ensure separation of the seized children from their natural parents to circumvent various procedural requirements of the Pennsylvania Child Protective Services Law; to wit:

     a.    Various required hearings before a master are held off the record or not at all;

     b.    The required hearing that must take place within 72 hours of the seizure of the children are off the record, sometimes not held at all, sometimes without the parents being permitted to attend the hearings;

    c.     Parents and children are represented by lawyers appointed and paid for by LCCYS whose loyalty is not to the natural parents and their children but rather to LCCYS;

    d.     As a result, lawyers appointed by LCCYS to represent the natural parents and their children do not advocate for the natural parents or children but rather advocate for LCCYS against the natural parent and their children;

    e.     The court appointed master, at the aforementioned procedural hearings actively discourages natural parents from obtaining outside counsel to represent them at these hearings.

19.    As a result of the aforementioned policies and customs which aggressively seize children from their natural parents without due process, LCCYS has a significantly disproportionate number of children which are placed in foster care as compared to surrounding counties in western Pennsylvania.

20.    As a result of the aforementioned policies and customs, the LCCYS amounts to the single largest budget item in Lawrence County's budget, more-so than any another operation.

21.    The majority of funds used to fund the aforementioned policies and customs comes from state and federal funding streams.

**Plaintiff A.T.'s Background Information**

22.    The Plaintiff A.T., prior to the events detailed herein, was one of the top welders in her industry as well as a rigging instructor.

23.    The Plaintiff A.T. is certified with the NRC which require background checks with the Department of Homeland Security, FBI and CIA.

24.     As a result of suffering years of abuse as a child, the Plaintiff A.T. was diagnosed with chronic post-traumatic stress disorder, anxiety, and depression, for which she regularly has seen and continues to see a therapist.

25.     Plaintiff A.T. gave birth to L.T. on May 26, 2010 and is the parent and natural guardian of L.T., a Plaintiff herein.

26.     Plaintiff A.T. gave birth to B.T. on February 5, 2013 and is the parent and natural guardian of B.T., a Plaintiff herein.

27.     On March 1, 2013, A.T. began dating K.B., an adult male with whom A.T. remained in a long-term relationship with until February 12, 2022.

28.     K.B., at all times pertinent to this Complaint was a Type 1 Diabetic.

29.     In the months leading up to February 12, 2022, K.B. began taking a new prescription medication to manage his diabetes.

30.     After K.B. began his new prescription medication, K.B. was feeling unwell and A.T. began noticing changes in K.B.'s behavior.

31.     A.T. took K.B. back to his doctor so K.B. could address the issues he was experiencing with the new medication.

**The February 12, 2022 Incident**

32.     On February 12, 2022, A.T. was in the living room watching television with B.T. when she heard a loud crash come from the bedroom where K.B. was sleeping.

33.    A.T. went into the bedroom to check on K.B. and found K.B. holding his head while sitting on the floor next to a nightstand.

34.    A.T. determined K.B. had rolled and fallen out of bed and hit his head on the nightstand.

35.    When A.T. entered the room and K.B. stood up, K.B. indicated he did not know who A.T. was, believing she was an intruder in their home, asked A.T. to get out of the house.

36.    K.B. had a permit to carry a concealed weapon and kept a GLOCK 9MM next to the bed.

37.    K.B. took hold of and cocked the gun.

38.    A.T.'s immediate response was to get L.T. and B.T. out of the house and instruct them to call 911 for help.

39.    K.B. then pointed the gun at A.T.'s head and fired the gun, but the bullet missed A.T.

40.    K.B. then immediately turned the gun toward himself and attempted to insert the gun into his mouth.

41.    A.T. remained in the room talking to K.B. and trying to get K.B. to recognize her and "talk him down".

42.    Shortly thereafter, the gun jammed, and AT. was able to disarm K.B.

43.    A.T. took possession of the gun, locked the gun in a gun cabinet, and got out of the house.

44.    Pennsylvania State Police responded to the 911 call, placed K.B. in handcuffs, and removed him from the home.

45.    At that time, L.T. told A.T. that K.B. had inappropriately touched her.

46.    A.T. immediately reported L.T.'s statement to a PSP Trooper at the scene.

47.    A.T.'s report to the PSP Trooper was recorded on body camera.

48.    A.T. immediately took L.T. to UPMC Children's Hospital for a rape kit, which proved to be negative.

49.    A.T. also told the officers that K.B. "was not acting right, something's wrong."

50.    A.T. handed officers K.B.'s insulin.

51.    K.B. was arrested and taken to jail.

52.    Even though A.T. informed everyone that K.B. had been experiencing medical events and that K.B. hit his head prior to the incident, K.B. was never taken to the hospital for evaluation.

53.    A.T. was told that she was to have no contact with K.B. and has never had contact with K.B. since that time.

54.    The next day, K.B.'s brother informed A.T. that K.B. had a Grade 3 Brain Hemorrhage, was in the Intensive Care Unit ("ICU") and would possibly require surgery.

## LCCYS becomes involved and removes L.T. and B.T. from A.T.

55.    LCCYS caseworker, the Defendant Christina Jones, accompanied by a LCCYS Supervisor, the Defendant Caitlyn Windhorst showed up at A.T.'s home and told A.T. that she needed to take L.T. for a forensic interview.

56.    A.T. had a boot on her foot due to a torn posterior tibial tendon and could not provide transportation, so Jones and Jones' Supervisor Caitlyn Windhorst agreed to transport A.T., L.T. and B.T. to the Children's Advocacy Center (hereinafter "CAC") for a forensic interview scheduled the following day.

57.    Jones and Jones' Supervisor transported A.T., L.T. and B.T. to the CAC for a forensic interview.

58.    Next, B.T. was taken back and interviewed with L.T.

59.    Over an hour later, A.T. was called back for questioning and the following conversation occurred:

      a.    A.T. was asked: "Will you let [K.B.] back in the house?"
           A.T. responded: "Well he has to come get his things, I can't do it myself."

      b.    A.T. was asked: "Do you believe your daughter?"
           A.T. responded: "I'm neutral. I don't know what's going on. I don't know what was said and due to past traumas of my own, I

don't want to jump to conclusions or not listen to what's going on first."

    c.    A.T. was asked: "Will you get a protection order?"
A.T. responded: "I have no idea what that entails and I was told I couldn't have one."

60.    Based solely on A.T.'s answer to those 3 questions, Jones decided that A.T. failed to protect her children and the children were no longer safe with A.T., and then removed them from A.T.'s custody.

61.    A.T. called her sister, K.S.M., who immediately drove to meet A.T. and the children at the CAC.

62.    When K.S.M. arrived in the lobby at the CAC, she said that she was A.T.'s sister and wanted to take L.T. and B.T. into her care.

63.    However, unbeknownst to A.T. and K.S.M., as soon as K.S.M. arrived in the lobby, Jones secretly and with police presence, escorted L.T. and B.T. out a back door and left.

64.    K.S.M. was denied temporary custody and was told she would need to hire an attorney.

65.    Jones and Windhorst, provided transport for A.T. to the CAC, but left her stranded with no transportation home, their only intention being to remove L.T. and B.T.

66.    There was no clear and convincing evidence that either L.T. or B.T. were in any form of danger in the home of A.T. and therefore there was no legal basis for the removal of L.T. and B.T. from A.T.'s custody.

**The Informal Two Hour Hearing**

67.    Pursuant to 23 Pa.C.S.A. §6315, a child taken into "protective custody" pursuant to that section and cannot be maintained in protective custody longer than 72 hours without an informal hearing under 42 Pa. C.S.§6332.

68.    According to the provision of 42 Pa. C.S.§6332, a parent or guardian of an alleged dependent child are entitled to certain rights which include the following:

   a.    Reasonable notice of the hearing, oral or written, stating the time, place and purpose of the hearing;

   b.    Prior to the commencement of a hearing, the court or master shall inform the parties of their rights to counsel and to appoint a counsel if they are needy persons;

   c.    If the child is alleged to be a dependent child, the court or master shall also determine whether reasonable efforts were made to prevent such placement.

69.    Within 72 hours of the taking of L.T. and B.T. from A.T., A.T. received a text message from the caseworker, the Defendant Jones.

70.    After L.T. and B.T. were taken from the custody of A.T., there was a bizarre proceeding in front of Susan Papa, Juvenile Court Master.

71.    At the hearing, if that's what it was:

a.     There was no proper notice given to A.T.;

b.     Prior to the commencement of the "hearing" if that's what it was, the master did not inform A.T. of her right to counsel or appointed counsel;

c.     At no time was there any determination made by the master that reasonable efforts were made to prevent placement.

72.    The text message in question only informed A.T. that there was an emergency zoom meeting and she was given zoom contact information.

73.    Prior to this "hearing" A.T. had received no communication from her children or from LCCYS personnel concerning where her children were or why they had been taken from her.

74.    When A.T. entered the zoom hearing she learned that present was Susan Papa, a master, Defendant Jones and Defendant Windhorst, her supervisor.

75.    At the commencement of the proceeding, Susan Papa asked A.T. the question, "Do you know why you are here?"

76.    A.T. responded, "I have no idea."  A.T. then asked where her children were and if they were ok and together.

77.    The master, Susan Papa, then stated, "There will be no more questions asked of me."

78.    Present in A.T.'s home at the time of the zoom meeting was her sister who happened to walk through the room.

79.    Upon observing A.T.'s sister walk through the room, Susan Papa indicated it was a "closed hearing" and she could end the meeting if the sister did not leave.

80.    A.T. was then questioned about who the fathers of her children were.

81.    Initially, she questioned why that was important and she was informed that if she didn't give their names immediately she could go to jail.

82.    A.T. then gave her the name of the father of L.T.

83.    At that point A.T. began to cry and asked about the welfare of her children again.

84.    Susan Papa said, "That's enough" and terminated the zoom meeting.

**<u>Second Hearing and Its Aftermath</u>**

85.    A second "hearing" was held thereafter.

86.    Appointed counsel for A.T. was  present, and A.T. was informed by counsel that he was a public defender there to represent her.

87.    Counsel said to A.T., "LCCYS already told me about you, and I don't have any urge to help you."

88.    According to appointed counsel, LCCYS told him that A.T. was "a bad parent" and "she did this to herself."

89.    A.T. didn't know where L.T. and B.T. were taken, if they were together, if they were safe, or if they were scared.

90.     A.T. wasn't allowed to talk to L.T. and B.T. for over a month after Jones took them from their home.

91.     For the first few permitted phone calls, A.T. was only given 10 minute per call, which allotted only 5 minutes with L.T. and 5 minutes with B.T.

92.     As soon as the 10 minutes were up, Jones hung up the phone to cut the call off.

93.     Jones hung up if L.T. and B.T. started to cry because they missed A.T.

94.     Jones told A.T. she hangs up because "it's causing them distress because you're making them sad."

95.     Jones refused to talk to A.T. about L.T. and B.T.

96.     If A.T. asked Jones about L.T. and B.T., Jones would tell A.T., "You're not my only case and you need to knock it off."

97.     Within the first week of being placed in a foster home, Jones told the foster parents that they would be able to adopt L.T. and B.T. by the second court hearing.

98.     L.T.'s birthday was within the first couple weeks after placement.

99.     For L.T.'s birthday, Jones gave L.T. a card and book about adoption and told L.T., "It will be okay, your new family is going to love you."

**Later Hearing**

100.   Susan M. Papa, Esquire presided over A.T.'s next hearing as a court-appointed Master.

101.   During the hearing Attorney Papa asked A.T., "are you ready for this to be over?"

102.   A.T. responded, "Yes, what do I need to do?"

103.   Attorney Papa replied, "sign over your rights."

**Third Hearing and Beyond**

104.   By the third hearing A.T. was still only allowed two phone calls per week and A.T. was not granted any visitation.

105.   Jones removed L.T. and B.T. from their home on February 12th and A.T. did not see L.T. or B.T. again until April, after Easter.

106.   And from this point until the end of 2023, all A.T. had with regard to visitation with her children was one weekly visit for 2 hours in a supervised location.

107.   A.T.'s phone calls with L.T. and B.T. were still limited, just two phone calls per week, but now 20 minutes per phone call was permitted.

108.   At some point thereafter, a new LCCYS Caseworker, Defendant Elizabeth Hall, was assigned to A.T.'s case.

109.   A.T. disagreed with a course of action Hall wanted to take on behalf of A.T.'s children and Hall became very authoritative and wanted to medicate L.T.

110.    A.T. disagreed with Hall and reasoned that L.T. did not need medication, she needed therapy.

111.    At that point Defendant Hall told A.T. that LCCYS was going to fight A.T. and that A.T. was not doing what's best for her children.

## LCCYS Erects Arbitrary Hurdles to Prevent Reunification of A.T. with her Children

112.    At every subsequent court hearing, A.T. was given some arbitrary reason as to why L.T. and B.T. could not be reunited with her.  More Specifically:

      a.    A.T. was told that L.T. and B.T. could not return home because K.B.'s whereabouts were unknown;

      b.    Then A.T. was told that L.T. and B.T. could not be reunited because A.T. needed to take a parenting class, which she did;

      c.    Then A.T. was told that L.T. and B.T. could not be reunited with her because A.T. needed trauma therapy.

113.    Every step of the way, with every task A.T. completed, there was always a new hurdle added for A.T. to jump through, as LCCYS continued to dangle the reunification of L.T. and B.T. in front of her.

114.    Ashley's third LCCYS caseworker assigned to the case was Evan Murphy.

115.    Prior to Murphy being assigned to her case, A.T. had been court-ordered to do family therapy but had been on a 6 month long waiting list.

116.   Up until that point, neither Jones, Jones' Supervisor Windhorst, nor Hall had done what was required of them which prevented A.T. to be able to complete what was required of her.

117.   Neither Jones, Jones' Supervisor Windhorst, nor Hall had completed a home visit that was required to prove that Ashley did, in fact, live alone.

118.   This continued for the next year and half, even though the Court required LCCYS to complete these requirements within the first 30 days of removal.

119.   Murphy was the first caseworker assigned to A.T.'s case who attempted to do any of what LCCYS had been required to do.

120.   Murphy was also the only caseworker who encouraged and helped A.T. develop a good relationship with L.T. and B.T.'s foster parents.

121.   Once word got back to LCCYS and the Court that A.T. had a good relationship with the foster parents, LCCYS threatened the foster parents with removal of L.T. and B.T. if they continued a relationship with A.T.

**The Vehicle Accident**

122.   On November 6, 2022, A.T. sustained life-threatening injuries from a vehicle accident.

123.   A.T.'s injuries were so severe that she spent 4 days in the ICU.

124.   A.T.'s physical injuries included, among other things brain hemorrhaging, neck injury requiring a neck brace, 12 bruised ribs, and inability to lift her arms.

125.   As soon as A.T. was discharged from the hospital, she went to the visit house and never missed a visitation because A.T. was able to communicate with Murphy.

126.   At this same time, L.T. and B.T. were in trauma therapy through the Lawrence County Children's Advocacy Center (CAC).

127.   The therapist, Erin McDevitt, never told L.T. or B.T. that A.T. was okay after the vehicle accident.

128.   McDevitt, only told L.T. or B.T. that A.T. "wrecked the car."

129.   McDevitt, a supposed child therapist, refused to let L.T. or B.T. know if their mother was alive after a serious car crash.

**Fabricated Reports**

130.   Defendant Stephanie Schiable became the 4th caseworker assigned to A.T.'s case.

131.   Defendant Schiable and the CAC perpetuated the long history of fabricated reports by previous LCCYS personnel and Defendants about A.T.'s ability to care for her children.

132.   In spite of numerous requests by counsel, LCCYS has declined to produce these reports.

133.   The Plaintiff A.T. has at all times denied access to the case-file and transcripts.

134.   The case file and transcripts from hearings involving A.T.'s case should demonstrate that nearly every report indicated that A.T. had not complied with Court orders which was a lie.

135.   The case file and transcripts from hearings involving A.T.'s case with LCCYS should indicate the Defendants falsely reported to the Court that A.T. was not doing what was required of her, while intentionally being the very impediment to A.T. completing her requirements.

136.   The case and transcripts from hearings should indicate that representatives from LCCYS falsely reported the following concerning A.T.:

   a.   The Defendants falsely reported to the Court that A.T. was unfit to parent L.T. and B.T.;

   b.   The Defendants falsely reported that while A.T. began dating her now husband, A.F. that A.T. was actually still seeing K.B. and maintaining communication with K.B. by using secret codes;

   c.   The Defendants falsely report that A.T. was encouraging L.T. and B.T. to have a relationship with a pedophile;

   d.   A.T.  was not permitted to date because she "might make the same mistake" and she "obviously doesn't know what [she's] doing."

137.   No matter what A.T. did or didn't do, Defendants manipulated the facts to serve their purpose of getting L.T. and B.T. adopted.

138.   LCCYS reported that there wasn't sufficient proof that A.T. was living alone.

139.   LCCYS/Defendants' report was based solely on A.T. having "men's shoes" and a "men's hoodie" at her home, refusing to believe that A.T. wore the shoes and hoodie herself.

**LCCYS Caused the Termination of A.T.'s Welding Career**

140.   LCCYS Defendants arbitrarily decided that A.T.'s career in the construction welding industry was not compatible with being a good mother to her children.

141.   LCCYS Defendants forced A.T. to quit her lifelong career because "being a construction worker, traveling, and being in a union while the kids are homeschooled is considered an unstable home environment."

142.   LCCYS Defendants indicated that if she quit her job there would be reunification with her children, she quit her union welding job which paid her $140,000 per year and  began working in hospice care, and enrolled in nursing school.

143.   And as a result, A.T. lost $110,000 of expected income and a lapse in some of her certifications she worked hard to obtain.

**LCCYS Forced Relationship with L.T.'s Estranged Biological Father**

144.    L.T.'s biological father, E.K., did not maintain a presence in L.T.'s life.

145.    E.K. signed over his parental rights.

146.    Over the years, E.K. occasionally paid child support just to avoid jail time or loss of Commercial Driver's License (CDL) and his driver's license.

147.    From the time L.T. was 8 months old, E.K. chose not to be involved in L.T.'s life.

148.    Fully informed of E,K.'s  absence all of L.T.'s life, LCCYS Defendants nonetheless knowingly and intentionally and on their own volition, involved E.K. in A.T.'s case.

149.    LCCYS Defendants knowingly and intentionally forced L.T. to have a relationship with E.K. against her wishes.

150.    L.T. expressed that she was not comfortable with E.K. and did not want to have a relationship with E.K.

151.    L.T., who was 13 years old at this time, had only seen E.K. approximately 3 times since L.T. was 8 months old.

152.    LCCYS Defendants, knowing that E.K. is not B.T.'s biological father, nonetheless knowingly and intentionally forced B.T. to have a relationship with E.K.

153.    As a result of the forced relationship, L.T. continuously suffered panic attacks and experienced severe anxiety when she was forced to have visits with E.K.

154.   In light of the fact that L.T., had only seen E.K. 3 times in the last decade, was not her father figure, but nonetheless was forced by LCCYS to maintain a custodial arrangement with a stranger and L.T. suffered severe mental anguish.

155.   LCCYS brought E.K. into a case he should not have been involved in and used the forced visits with E.K. To prolong the separation between L.T. and B.T. with A.T., all the while condemning A.T.'s parenting.

**LCCYS forces A.T. to Leave her Home**

156.   In September of 2023 LCCYS Defendants sought and obtained a Court Order that gave A.T. 30 days to find a new place to live so her children L.T. and B.T. could have overnight visits with her.

157.   The rationale forcing A.T. to move from her home was that visiting the home  where the "incident" took place would be too traumatic for L.T. and B.T.

158.   Thus, LCCYS duly forced A.T. to leave the home she had made for L.T. and B.T. and where they had been residing for several years which provided a yard for free-range chickens that L.T. and B.T. considered pets.

159.   The forced move resulted in A.T.'s rent which was $700 a month being increased to $1,100 per month.

**Reunification Between A.T. and L.T. and B.T.**

160.   A.T. temporarily obtained physical custody of L.T. and B.T. in December of 2023.

161.    On January 3, 2024, LCCYS employees, Defendant Schaible and her supervisor, Defendant Caitlyn Windhorst, showed up unannounced at A.T.'s apartment while A.T. was at work.

162.   L.T. and B.T. were at the apartment under the care of A.F., A.T.'s long-time friend and now husband.

163.  Learning that A.F. was the boyfriend of A.T., the Defendant Schaible became hostile.

164.  On January 5, 2024, A.T. received an email from Rachael Hardester, a LCCYS paralegal, stating that a Permanency Review hearing was scheduled for January 19, 2024:

> **Subject: Townsend**
>
> Good Afternoon,
>
> The Townsend children are scheduled for a Permanency Review hearing on January 19, 2024, at 1:00.   The Caseworker went to the home unannounced today, January 3, 2024, and the children were being cared for by a male from Ohio who claims to be the mother's boyfriend.   Per the court order filed November 13, 2023, no adult male is permitted in the home during any visit and no adult male is to have contact of any nature with the children during a visit.  The children reported to the caseworker that the male did spend the night but they that they felt safe.   The Agency would like to expedite the hearing to have this situation addressed by the court. Please respond to this email with your position regarding this matter as soon as possible.
>
> Thanks
>
> **Rachael Hardester**
>
> LSI Paralegal
>
> Lawrence County Children and Youth Services

165. At some point thereafter, but prior to the scheduled January 19, 2024 Permanency Review hearing, A.T.'s counsel David Wenger discovered Defendant Schaible had a known conflict of interest that she had never disclosed.

166. The Defendant Schaible, having this known conflict of interest which she did not disclose used this conflict as a vehicle for her own ends.

167. On January 17, 2024, after the conflict was exposed, and as a result of the exposure of the conflict, LCCYS released full custody of L.T. and B.T. to A.T. and informed A.T. that her case would be closed on January 19, 2024.

168. As soon as L.T. and B.T. were returned to A.T., A.T. immediately scheduled appointments for L.T. and B.T. to continue trauma therapy with a legitimate therapist.

169. On February 15, 2024, A.T. was alerted that L.T. had started cutting herself while in LCCYS custody as a way to deal with the trauma she was experiencing as a result of the actions of LCCYS employees including Erin McDevitt, L.T.'s trauma therapist.

**Hardships Created by Illegal Actions of LCCYS**

170. As a result of LCCYS and its employees, A.T., L.T. and B.T. have suffered numerous hardships as follows:

      a.    In order to obtain reunification with her children, A.T. was forced to leave employment which paid her $140,000 annually and to take employment paying her $30,000 annually, causing an annual loss of income of $110,000;

b.    In order to obtain reunification with her children, A.T. was put into a position where she had to work three different jobs to make ends meet;

c.    In order to obtain reunification with her children, A.T. was forced to move to an inferior home with substantially higher rent;

d.    In order to obtain reunification with her children, LCCYS Defendants destroyed any resemblance of family life for A.T. and her children;

e.    In order to obtain reunification with her children, LCCYS Defendants caused A.T., B.T. and L.T. to miss holidays such as Christmas, New Year, Valentine's Day, Fourth of July, Thanksgiving, birthdays and    other important events in L.T. and B.T.'s lives;

f.    In order to obtain reunification with her children, LCCYS Defendants forced L.T. and B.T. to engage in a relationship with E.K. for whom they had no prior relationship;

g.    In order to obtain reunification with her children, LCCYS Defendants placed arbitrary restrictions on who A.T. was allowed to associate with or be permitted to around L.T. and B.T.;

h.    In order to obtain reunification with her children, LCCYS Defendants controlled A.T.'s ability to engage in a meaningful relationship with a male partner;

i.    In order to obtain reunification with her children, A.T. had to endure the threats of LCCYS Defendants to imprison her if she did not accede to their unreasonable and illegal demands;

j.    In order to obtain reunification with her children, LCCYS Defendants forced L.T. to endure therapy sessions with Erin McDevitt who traumatized L.T.;

k.    L.T. and B.T. suffered severe emotional trauma from being ripped, without cause, from their family relationship;

l.    L.T. and B.T. suffered severe emotional trauma from being taken, without cause, from their mother and placed into the custody of strangers;

m.    A.T. suffered severe emotional and psychological trauma as a result of having her children taken, without cause from her;

n.    A.T. suffered severe emotional and psychological trauma as a result of not knowing what happened to her children after they had been removed from her custody without cause.

171.    In spite of the foregoing which caused and was intended to cause A.T.'s life to become intolerable, A.T. refused to accept "the easy way out" by signing away her parental rights as demanded by Master Susan Papa.

## Public Statements made by Director John Bout about LCCYS policy with regard to removal of children

172.    On July 13, 2021 at a meeting of the County Commissioners, former Lawrence County Commissioner Morgan Boyd stated,

> "Lawrence County CYS amounts to the single largest budget item in the county's budget, more-so than any other area of operation. We spend more dollars per year on CYS than anywhere else. Granted that a majority of those dollars come from state and federal funding streams."

173.    In response to questioning from Boyd, Defendant Bout stated, among other things, about why Lawrence County has significantly more children in their custody compared to the combined totals of the larger surrounding counties:

"Our professionals, whether court professionals or agency professionals take very seriously and we operate from a perspective of we would prefer to err on the side of caution related to child safety."

## Procedural Violations with Lawrence County Children and Youth Services

174.   On February 12, 2022 there was no competent Order of Court authorizing L.T. and B.T. to leave the residence and custody of A.T. as required by the Pennsylvania Child Protective Services Law, more specifically, 23 Pa. C.S.A. §6315(a)(4).

175.   On February 12, 2022, there was no competent Order of Court granting sole physical custody of L.T. and B.T. to foster parents or anyone else.

176.   At no time were any of the Defendants entitled to take L.T. and B.T. into custody under the laws of arrest.

177.   At no time was protective custody immediately necessary to protect the minor children, L.T. and B.T., in Plaintiff A.T.'s care from further serious physical injury, sexual abuse or serious physical neglect; one of which is required under the provisions of 23 Pa. C.S.A. §6315 and 42 Pa. C.S.A. §6324 before a child may be taken into protective custody.

178.   Defendants Lawrence County LCCYS by and through their agents John Bout, Christina Jones, Elizabeth Hall, Stephanie Schaible and Caitlyn

Windhorst violated the Plaintiffs' civil rights and the provisions of and procedural

safeguards under Pennsylvania Child Protective Services Law as follows:

    a.    Taking L.T. and B.T. into protective custody without reasonable grounds, specifically without reasonable grounds to believe that the minor children were abused or in imminent risk of serious bodily or physical injury;

    b.    Holding L.T. and B.T. in protective custody for greater than 24 hours without obtaining a Court Order to do so;

    c.    Holding L.T. and B.T. in protective custody for greater than 24 hours without even attempting to obtain a Court Order authorizing them to do so;

    d.    Failing to hold a conference with the Plaintiff A.T. within 48 hours at the minor children were taken into protective custody;

    e.    Failing to explain to A.T. within 48 hours of taking the minor children into protective custody, the rights provided to them pursuant to 42 Pa. C.S.A. §6337 and §6338;

    f.    Failing to explain to A.T. that in order to remove the minor children from their home, they were required to have reasonable grounds to suspect such removal was necessary;

    g.    Failing to expedite the return of the minor children L.T. and B.T. to A.T.'s custody, and in fact encouraging and facilitating the children's prolonged absence from A.T.'s home through the obstruction of the filing of false motions by the Court;

    h.    Failing to facilitate the return of the children to A.T.

    i.    Failing to facilitate the return of the children to A.T. upon learning that K.B. was not and would never be in A.T.'s home.

179.   In removing the minor children from the A.T.'s home, disregarding

procedural safeguards and orchestrating the filing of motions and petitions with the

Court, the Defendants violated the responsibility of Child Protective Services to preserve and stabilize family life as required by the Pennsylvania Child Protective Services Laws.

180.   Through their actions, particularly by removing the minor children from the care and custody of the Plaintiff A.T.  and taking them into protective custody without reasonable grounds, by orchestrating the filing of various custody petitions, by failing to fully investigate the allegations of child abuse prior to removal of custody, by failing to hold the appropriate hearings and obtain the necessary Court Orders, by actively participating in custody proceedings to keep the children in question away from A.T. and by failing to inform A.T.: (1) of her rights under the laws and (2) that LCCYS is required to have reasonable grounds to suspect such removal is necessary, the Defendants did not act  in good faith and therefore are not entitled to immunity as provided under the provisions of 23 Pa. C.S.A. §6318.

181.   As a proximate and direct result of the aforesaid acts of the Defendants, Lawrence County LCCYS, John Bout, Christina Jones, Elizabeth Hall, Stephanie Schaible and Caitlyn Windhorst the Plaintiffs A.T., L.T. and B.T. have suffered and will continue to suffer the following:

      a.     Psychological damage, including loss of self-esteem, mental anguish, embarrassment and humiliation;

      b.     Destruction of the family unit;

    c.     Loss of income;

    d.     The incurrence of substantial obligations for attorneys' fees, court costs and other expenses and costs in defense of their civil liberties because of the unwarranted and unfounded acts on the part of the defendants.

182.   As a proximate and direct result of the aforesaid acts of the Defendants, LCCYS, John Bout, Christina Jones, Elizabeth Hall, Stephanie Schaible and Caitlyn Windhorst the Plaintiffs L.T. and B.T. have suffered and will continue to suffer the from the disruption of their familial relationship.

**LCCYS refusal to provide A.T.'s file to Plaintiff's Counsel**

183.   Plaintiff's counsel has made numerous attempts to retrieve A.T.'s file from LCCYS; with no response.

184.   The following attempts have been made:

    a.    Initially, on April 1, 2024 Plaintiff's counsel mailed a letter to LCCYS requesting A.T.'s file; **with no response**.

    b.    On May 7, 2025 my paralegal, Audrey Conner, contacted LCCYS concerning when we would be receiving A.T.'s file. Ms. Conner spoke to an individual who identified herself as Michelle.

    c.    Michelle indicated to Ms. Conner that the matter had been placed in Attorney John J. Bongivengo's hands and undersigned counsel would have to deal with him to get the file.

    d.    On May 8, 2025 Plaintiff's counsel emailed a letter to Attorney Bongivengo outlining attempts to obtain A.T.'s file and asked when counsel would receive the contents of A.T.'s file; **with no response**.

e. On May 13, 2025 Plaintiff's counsel emailed a letter to Attorney Bongivengo outlining counsel's attempts to obtain A.T.'s file and asked when counsel would receive the contents of A.T.'s file; **with no response**.

## COUNT I

**A.T., individually and as parent and natural guardian of L.T. and B.T., minors**

**v.**

**Lawrence County Children and Youth Services, John Bout, Director of Lawrence County Children and Youth Services, in his individual capacity, Christina Jones, in her individual capacity, Elizabeth Hall, in her individual capacity, Stephanie Schaible, in her individual capacity,  Caitlyn Windhorst, in her individual capacity.**

### <u>42 U.S.C. §1983</u>

185.    The prior paragraphs are incorporated herein by reference as if fully set forth at length.

186.    At all times relevant, Defendants Lawrence County LCCYS, John Bout, Christina Jones, Elizabeth Hall, Stephanie Schaible and Caitlyn Windhorst and are being sued in both their individual and official capacities.

187.    The Defendants through their agents and employees, were acting under color of state law, acted willfully, knowingly and purposefully, with the intent to deprive the Plaintiffs of their liberty interests and rights, privileges and immunities secured by the Constitution and the laws of the United States, in violation of 42 U.S.C. §1983, particularly:

a.    Their liberty and privacy interest in maintaining custody

31

of the minor children, L.T. and B.T. without undue interference including removal from the home without notice and a hearing;

b.    The right of familial associations;

c.    The right to freedom of intimate association;

d.    The rights to substantive and procedural due process as secured by the 14th Amendment;

e.    The right to be free from excessive force; and

f.    The right to be secure in one's person and property.

188.   The Defendants John Bout, Christina Jones, Elizabeth Hall, Stephanie Schaible and Caitlyn Windhorst were acting, at all times relevant hereto, in accordance with a well-established custom and/or policy of the Defendants, Lawrence County LCCYS in conducting their investigation of A.T.'s family. More specifically, the policy of Lawrence County LCCYS was one which instructed the LCCYS caseworkers to remove children who are the subjects of a child abuse investigation without due process, and further to wrongfully utilize custody proceedings to circumvent the rights afforded by the Pennsylvania Child Protective Services Law, all of which are contrary to the Pennsylvania Child Protective Services Law, which requires that caseworkers have reasonable grounds to believe that abuse has occurred and that they follow certain, unalterable procedures.

189.   Lawrence County LCCYS as a matter of policy and practice, has with deliberate indifference failed to adequately discipline, train or otherwise direct or supervise its caseworkers concerning the rights of citizens, thereby causing John Bout, Christina Jones, Elizabeth Hall, Stephanie Schaible and Caitlyn Windhorst to engage in the unlawful, above-described conduct.

190.   The acts of the Defendants by and through their agents, represent conduct which was intentional, willful, outrageous, reckless and deliberately indifferent to the health, safety and welfare of the Plaintiffs.

191.   The Defendants' conduct in this matter "shocks the conscience".

192.   The Defendants' conduct in this action was clearly arbitrary and unreasonable, having no substantial relationship to the public health, safety, morals or general welfare.

193.   The Defendants knew or reasonably should have known that their actions, as well as the actions taken by their agents and representatives, with regard to the Plaintiff would violate the constitutional rights of the Plaintiffs as heretofore set forth.

194.   The Plaintiffs have suffered damages as set forth above.

WHEREFORE, the Plaintiffs A.T., individually and as parent and natural guardian of L.T. and B.T. demand the following:

      a.    Judgment in their favor and against the Defendants in an amount in excess of $50,000;

b. Punitive damages against John Bout, Christina Jones, Elizabeth Hall, Stephanie Schaible and Caitlyn Windhorst in their individual capacities;

c. Costs and attorneys' fees; and

d. Equitable relief requiring Lawrence County LCCYS to:

 i. Terminate the policy of removing children from their parents without following the procedural safeguards of the Pennsylvania Child  Protective Services Law;

 ii. Access to A.T.'s file with LCCYS;

 iii. Such relief as the Court deems necessary.

A JURY TRIAL IS DEMANDED.

## COUNT II

**A.T., individually and as parent and natural guardian of L.T. and B.T., minors**

**v.**

**Lawrence County Children and Youth Services, John Bout, Director of Lawrence County Children and Youth Services, in his individual capacity, Christina Jones, in her individual capacity, Elizabeth Hall, in her individual capacity, Stephanie Schaible, in her individual capacity,  Caityln Windhorst, in her individual capacity.**

### 42 U.S.C. §1983

### Request for Appointment of Receiver

195.   The prior paragraphs are incorporated herein by reference as if fully set forth at length.

196.   The policies, customs, practices and procedures as heretofore set forth are of a longstanding duration.

197.   The policies, customs, practices and procedures of the LCCYS have been subject to review by the Pennsylvania Department of Human Services who determined there were numerous regulatory violations involved in cases of a similar nature to that of the Plaintiffs herein.

198.   The investigations conducted by the Pennsylvania Department of Human Services have led to a license revocation for LLCYS and the issuance of provisional licenses under 62 Pa. C.S.A. §1008.

199.   As of February 26, 2025, LCCYS operates on its third consecutive provisional license since 2023.

200.   The Defendants herein, including the management of LCCYS have shown no inclination to discontinue their illegal conduct.

201.   Therefore, it appears the only way for prevention of the illegal and institutional behavior is for this Court to appoint a receiver to take over the management of the LCCYS.   More specifically:

     a.   Institute procedures which comply with the Child Protective Services Law with regard to removing children from their parents;

     b.   Conduct training of personnel, including caseworkers and their supervisors concerning grounds for removing children from their parents;

     c.   Establish procedures with regard to hearings that ensure the safety of the children involved and the rights of the parents of the children.

## PENDENT STATE CLAIMS

202.   This Court has pendent jurisdiction over the subsequent claims alleged herein and arising under the laws of the Commonwealth of Pennsylvania, pursuant to the principals as stated by the United States Supreme Court in **Hurn v. Oursler**, 289 U.S. 238 (1933), and **United Mine Workers of America v. Gibbs**, 383 U.S. 716 (1966).

## COUNT III

**A.T., individually and as parent and natural guardian of L.T. and B.T., minors.**

**v.**

**Lawrence County Children and Youth Services, John Bout, Director of Lawrence County Children and Youth Services, in his individual capacity, Christina Jones, in her individual capacity, Elizabeth Hall, in her individual capacity, Stephanie Schaible, in her individual capacity,  Caityln Windhorst, in her individual capacity.**

## <u>INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS</u>

203.   The prior paragraphs are hereby incorporated by reference and alleged as though set forth in their entirety.

204.   The aforementioned conduct of the Defendants John Bout, Christina Jones, Elizabeth Hall, Stephanie Schaible and Caitlyn Windhorst contains statements and actions which were engaged in utter disregard of the Plaintiffs' feelings, sensitivities and emotional well-being.

205.   The aforesaid actions of the Defendants John Bout, Christina Jones, Elizabeth Hall, Stephanie Schaible and Caitlyn Windhorst were done maliciously, willfully and intentionally.

206.   The aforesaid actions of the Defendants John Bout, Christina Jones, Elizabeth Hall, Stephanie Schaible and Caitlyn Windhorst were intended to and did inflict severe emotional distress upon the Plaintiffs.

207.   The aforesaid actions of the Defendants John Bout, Christina Jones, Elizabeth Hall, Stephanie Schaible and Caitlyn Windhorst constitute extreme and outrageous conduct.

208.   As a direct result of the intentional, malicious and outrageous conduct of the Defendants John Bout, Christina Jones, Elizabeth Hall, Stephanie Schaible and Caitlyn Windhorst, the Plaintiffs have suffered severe emotional distress and physical injuries as set forth more fully above.

WHEREFORE, the Plaintiffs demand judgment against the Defendants John Bout, Christina Jones, Elizabeth Hall, Stephanie Schaible and Caitlyn Windhorst in an amount in excess of $50,000, plus punitive damages, costs and such other relief as the Court may deem proper.  A JURY TRIAL IS DEMANDED.

## COUNT IV.

**A.T., individually and as parent and natural guardian of L.T. and B.T., minors**

**v.**

**Lawrence County Children and Youth Services, John Bout, Director of Lawrence County Children and Youth Services, in his individual capacity, Christina Jones, in her individual capacity, Elizabeth Hall, in her individual capacity, Stephanie Schaible, in her individual capacity,  Caitlyn Windhorst, in her individual capacity.**

## NEGLIGENCE

209.   The prior paragraphs are hereby incorporated by reference and alleged as though set forth in their entirety.

210.   At all times relevant, the Defendants had a duty of care to the Plaintiffs.

211.   The Defendants breached this duty of care of the Plaintiffs.

212.   The negligence of the Defendants John Bout, Christina Jones, Elizabeth Hall, Stephanie Schaible and Caitlyn Windhorst consisted of, at least in the following:

      a.   Improperly filing the charge of abuse and commencing an investigation;

      b.   Failing to terminate the investigation immediately upon learning that it was unfounded;

213.   The damages of the Plaintiffs are the direct and proximate result of the negligence and misconduct of the Defendants.

214.   The actions of the Defendants were malicious, wanton, reckless, and in complete disregard for the well-being of the Plaintiffs and constitute gross misconduct and the Plaintiffs are entitled to punitive damages.

WHEREFORE, the Plaintiff A.T. individually and as parent and natural guardian of L.T. and B.T. demand judgment in their favor and against these Defendants in an amount in excess of $50,000.00, plus punitive damages, costs and such other relief as the Court may deem proper.  A JURY TRIAL IS DEMANDED.

## COUNT V.

### A.T., individually and as parent and natural guardian of L.T. and B.T., minors

### v.

### Lawrence County Children and Youth Services, John Bout, Director of Lawrence County Children and Youth Services, in his individual capacity, Christina Jones, in her individual capacity, Elizabeth Hall, in her individual capacity, Stephanie Schaible, in her individual capacity,  Caityln Windhorst, in her individual capacity.

## <u>CIVIL CONSPIRACY</u>

215.   The prior paragraphs are hereby incorporated by reference and alleged as though set forth in their entirety.

216.   The Defendants, Lawrence County LCCYS, John Bout, Christina Jones, Elizabeth Hall, Stephanie Schaible and Caitlyn Windhorst, acting in concert with each other and other persons, maliciously, without just cause or excuse, and with the willful intent to injure the Plaintiffs, conspired to remove L.T. and B.T. from the Plaintiff A.T.'s home without probable cause or factual basis and to deprive the Plaintiffs of their civil rights.

217.   In committing the acts set forth above, the Defendants were without legitimate cause or justification and were animated by malice toward the Plaintiffs with the willful intent to injury the Plaintiffs.

218.   As a result of said malicious and willful acts, the Plaintiffs have suffered damages as set forth above.

WHEREFORE, the Plaintiffs demand judgment in their favor and against the Defendants in an amount in excess of $50,000.00, plus costs and punitive damages.  A JURY TRIAL IS DEMANDED.


## COUNT VI.

**A.T., individually and as parent and natural guardian of L.T. and B.T., minors**

**v.**

**Lawrence County Children and Youth Services, John Bout, Director of Lawrence County Children and Youth Services, in his individual capacity, Christina Jones, in her individual capacity, Elizabeth Hall, in her individual capacity, Stephanie Schaible, in her individual capacity,  Caityln Windhorst, in her individual capacity.**

### <u>TORTIOUS INTERFERENCE WITH FAMILIAL RELATIONS</u>

219.    The prior paragraphs are incorporated herein by reference as if set forth fully at length.

220.    Defendants interfered with the natural familial relationship between children and their parent by depriving the children from the parent and attempting to sever the legal connection between the children and their parent.

221.    Defendants purposefully withheld L.T. and B.T. from their parent A.T. and made repeated false representations regarding A.T.'s fitness as a parent with the intent of harming the familial relationship between them.

222.   Defendants lacked any privilege or justification to harm the familial relationship between Plaintiffs.

223.   As a result of Defendants' misconduct, Plaintiffs suffered from the deprivation of love, companionship, society, affection, grief, and suffering of the loss of children when the children were withheld for over two years.

WHEREFORE, Plaintiffs demand judgment against the Defendants in an amount in excess of the arbitration limits, plus costs, punitive damages, and such relief as the Court may deem proper.   A JURY TRIAL IS DEMANDED.

Respectfully submitted,

THE LINDSAY LAW FIRM, P.C.,


*s/ Alexander H. Lindsay, Jr.*
Alexander H. Lindsay, Jr.
PA I.D. No.  15088
Counsel for Plaintiffs
110 East Diamond Street, Suite 301
Butler, PA  16001
Phone:  (724)282-6600
Fax:  (724) 282-2672
al.lindsay186@gmail.com
michele@lindsaylawfirm.com